# Peoples Natural Gas Co., Appellant, *v.* Public Service Commission.

*Public service companies—Field of service—Abandonment of franchise—Surrender of charter—Act of April 9, 1856, P. L. 293 —Special privileges.*

1. Public service companies are not now permitted to eliminate any locality from their field of service, without first obtaining the consent of the Public Service Commission.

2. This is so whether the service sought to be abandoned is at wholesale or retail, is direct or indirect, or is required or only authorized by the company's charter.

3. The Act of April 9, 1856, P. L. 293, provides the course of procedure where public service companies wish to surrender their charters and retire from business; this is not regulation, and is not within the purview of the Public Service Company Law.

4. Special rights, powers and privileges enjoyed by public service companies prior to the passage of the Public Service Company Law are preserved to them by article III, section 12, thereof, only when such subject-matters are not specifically covered by the provisions of that statute.

*Constitutional law — Adequate legal remedy — 14th Federal Amendment — Regulation of public service companies — Impairment of contracts.*

5. A decree does not violate the due process of law clause of the 14th Amendment of the Constitution of the United States, when it gives to the party complaining an adequate legal remedy to obtain all his rights.

6. Proper state regulation of public service companies does not violate the constitutional provisions forbidding the impairment of contracts.

*Public service companies—Interstate commerce—Sale of commodity in bulk—State regulation—Rates—Natural gas—Interstate Commerce Act of February 4, 1887, 36 Stat. at L. 539, 544.*

7. Where a commodity is bought in one state, to be delivered in or carried to a given point in another, interstate commerce ends

at that point, and this is so although the purchaser intends to transport the commodity still further into the last named state.

8. Interstate commerce secures to the purchaser, however, the right to sell the commodity in bulk, at the point of destination as thus determined.

9. Under the Interstate Commerce Act of February 4, 1887, ch. 309, section 7, 36 Stat. at L. 539, 544, natural gas, although in interstate commerce, is subject to reasonable regulation by the state in which it is to be distributed to consumers, exactly as if it were produced in that state.

10. This regulation may cover matters of service in the particular state, as well as the rates to be charged consumers therein.

11. State regulation of commodities in interstate commerce is permissible, if it is not discriminatory and only indirectly and remotely affects such commerce.

*Public service companies—Regulation—Confiscation—Review by courts—Final order—Leave to discontinue service—Appeal.*

12. If confiscation may result, state regulation of public service companies, whether engaged in interstate or intrastate commerce, is subject to review by the courts as to all questions of law or fact involved in the regulation.

13. Not decided, whether an order requiring a public service company to continue supplying consumers in a particular locality, until the Public Service Commission has given leave to discontinue the service there, is so far final as to be the proper basis of an appeal.

Argued September 25, 1923. Appeals, Nos. 19 and 20, Oct. T., 1923, by Peoples Natural Gas Co., from judgments of Superior Court, April T., 1922, Nos. 107 and 108, affirming orders of Public Service Commission Nos. 1083 and 1098, Complaint Docket, 1916, in cases of Peoples Natural Gas Co. v. Public Service Commission, Johnstown Fuel Supply Co. and Joseph Cauffiel, Mayor of Johnstown, intervening defendants, and Peoples Natural Gas Company v. Public Service Commission and Johnstown Fuel Supply Co., intervening defendant. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Appeals from judgments of Superior Court. See 79 Pa. Superior Ct. 560.

The opinion of the Supreme Court states the facts.

Orders affirmed. Plaintiff in both cases appealed.

*Errors assigned* were, inter alia, judgments, quoting them.

*George B. Gordon,* with him *Arthur E. Young, Allen T. C. Gordon* and *S. G. Nolin,* for appellant.—Neither under the Natural Gas Act, nor under any other statute or the common law or any custom, is an obligation imposed on a natural gas company to furnish another natural gas company with gas: St. Clairsville Village v. Public Utilities Com., 102 Ohio 574; Hutchinson G. & F. Co. v. Gas Co., 267 Fed. 35; City of Winfield v. Gas Co., 267 Fed. 47; Public Utilities Com. v. Landon, 249 U. S. 236; State v. Litchfield, 97 Kans. 592.

The relation between the Peoples Natural Gas Company and the Johnstown Fuel Supply Company is purely contractual.

Under any contingency, from the time the Peoples Natural Gas Company amended its charter eliminating the City of Johnstown from its territory of supply, the Public Service Commission no longer had power afterward to compel the company to supply natural gas for use in that district.

The Public Service Commission has no power to compel the Peoples Natural Gas Company to import natural gas into Pennsylvania from West Virginia and to sell it to the Johnstown Fuel Supply Company at the city gate of Johnstown in such quantities as the Public Service Commission may see fit to designate and at such prices as it may fix, because this is an interference with, and regulation of, interstate commerce: West v. Gas Co., 221 U. S. 229; Haskell v. Gas Co., 224 U. S. 217; Public Utilities Com. v. Landon, 249 U. S. 236; Penna. Gas Co. v. P. S. C., 252 U. S. 23; United Fuel Gas Co. v. Halla-

nan, 257 U. S. 277; Eureka Pipe Line Co. v. Hallanan, 257 U. S. 265.

*J. E. B. Cunningham,* with him *Tillman K. Saylor,* City Solicitor, and *Spencer G. Nauman,* for intervening appellee, City of Johnstown.

*David I. McCahill,* of *McCahill, McCahill & Tabor,* for intervening appellee, Johnstown Fuel Supply Company. —From the very beginning, the Peoples Natural Gas Company has been engaged in a public service in supplying gas to the Johnstown Fuel Supply Company for distribution in the City of Johnstown and surrounding communities.

The Peoples Natural Gas Company has not shown any justification for discontinuing the furnishing of natural gas to the Johnstown Fuel Supply Company for distribution in the City of Johnstown and surrounding communities.

No constitutional right of the Peoples Natural Gas Company was invaded by the order of the commission: Penna. Gas Co. v. P. S. C., 252 U. S. 30; Public Utilities Com. v. Landon, 249 U. S. 236.

OPINION BY MR. JUSTICE SIMPSON, February 4, 1924:

The Peoples Natural Gas Company (hereinafter called the Peoples Company) was chartered by the Commonwealth, under the provisions of the Natural Gas Act of May 29, 1885, P. L. 29, for the purpose of dealing in, transporting and supplying natural gas to the public, and was authorized (subject to obtaining municipal consent to the occupancy of the streets) to furnish it in a large number of municipalities of this State, among them, by an amendment to the charter, being the City of Johnstown.

At the time the Public Service Company Law of July 26, 1913, P. L. 1374, went into effect, and during the entire period covered by this litigation, the Peoples Com-

pany purchased much of the gas it needed from the Hope Natural Gas Company of West Virginia, (a "separate and independent" corporation, hereinafter called the Hope Company) which piped it from wells in that state to a point on the line between the states of Pennsylvania and West Virginia, and there delivered it into the pipe line of appellant, which had no title to or interest in the gas until it passed into Pennsylvania, the Hope Company having none thereafter. In the petitions and answers filed by appellant, it is repeatedly stated that the gas was furnished because of a contract between the two companies, the terms of which were not disclosed, however, the only evidence on the point being that the gas was purchased "in West Virginia, at the West Virginia state line, by meter measurement."

The pipe line of the Peoples Company, containing the gas thus purchased, was connected, at various points in this state, with other pipe lines, carrying gas obtained from its Pennsylvania wells, and part of the combined gas was delivered by it to consumers in a large number of municipalities of the state, before reaching a point opposite the City of Johnstown. In order that gas might be supplied to users in that city, appellant entered into a contract with the Johnstown Fuel Supply Company (hereinafter called the Johnstown Company, which was also chartered under the Natural Gas Act of 1885, and had municipal consent to the use of the streets), by virtue of which appellant expressly agreed to and thereafter did construct a spur from its main line to a point near the city, and there connected with the line of the Johnstown Company, through which gas was delivered to consumers in that city, appellant receiving, as consideration for the gas so furnished, certain percentages of the amounts paid by the consumers. It subsequently continued its pipe line beyond Johnstown, and since then has supplied private consumers in certain municipalities reached by this extension. None of its gas is sent out of the State of Pennsylvania.

On July 15, 1916, the Johnstown Company filed a new tariff, increasing its rates; objections were made thereto, and it appearing to the Public Service Commission that one of the causes, partly relied on as justifying the increase, was the price payable to the Peoples Company, under the contract above referred to, the commission directed that the latter company be cited and an opportunity given it to be heard. It answered, denying the jurisdiction of the commission, claiming that performance of the contract with the Johnstown Company was not a public service, and also because, until actual delivery, the gas was in interstate commerce, and not subject to state regulation. Evidence was taken, and later appellant moved to dismiss the proceedings against it, for the reasons set forth in its original answer. The commission overruled the motion, and directed appellant to file a tariff of rates. Instead of doing this, it appealed to the Superior Court (sub nom. Franke v. Johnstown Fuel Supply Company, 70 Pa. Superior Ct. 446), which affirmed the order of the commission. An appeal, then taken to this court, was dismissed, solely because the order complained of was interlocutory, and, standing alone, was not the subject of an appeal: Peoples Natural Gas Company v. Public Service Commission, 268 Pa. 235.

In the meantime, pending our decision as above, appellant duly cancelled its contract with the Johnstown Company, effective as of October 1, 1920, and gave notice of its intention to deliver no more gas after that date. Before that time arrived, however, appellant complied with the order of the commission, by filing a tariff as between it and the Johnstown Company, specifying therein the rates named in the contract, and adding that service would be discontinued in accordance with the notice above mentioned.

On September 1, 1920, the mayor of Johnstown, as an individual consumer of gas and as the representative of the citizens generally, filed with the commission a pe-

tition against both the Johnstown Company and the Peoples Company, asking that the latter be required to continue the supply of gas to the former, despite said notice. The former answered, joining in the prayer of the petition. The latter also answered, renewing its objections to the jurisdiction of the commission, averred that it, appellant, had a right to discontinue the service, and that a steady decrease in its supply of gas compelled it to do so, because of its alleged paramount duty to private consumers in municipalities where it furnished gas to them directly. A hearing was had, and an interlocutory order made requiring appellant, until further order of the commission, to continue supplying gas to the Johnstown Company, for use by consumers in that city.

On January 27, 1921, appellant filed in the office of the secretary of the Commonwealth, a paper certifying that, by proper corporate action, taken in accordance with section 5 of the Natural Gas Act, it had altered its territory for the supply of natural gas, by eliminating the City of Johnstown therefrom; and, based upon this action, and its objections to the jurisdiction of the commission, it filed with the latter a petition for the vacation of the interlocutory restraining order. The Johnstown Company made answer, and in turn applied to the commission to fix the rates to be paid by it to appellant, pendente lite. Testimony was taken on these various applications, a hearing had, and the commission decided that, under the Public Service Company Law, appellant could not limit its field of service without the consent of the commission, which had neither been asked nor granted. It therefore directed the supply to be continued until such consent was obtained, but gave appellant leave to file a new tariff.

From this decision, the Peoples Company appealed to the Superior Court, which affirmed the order of the commission (Peoples Natural Gas Co. v. Public Service Commission, 79 Pa. Superior Ct. 560); and from that decree the present appeal was allowed. In this court

the argument took a far wider range than the exigency of the case warranted. If appellant had no right, under our statute, to curtail its field of service and refuse to deliver gas in a part thereof without first obtaining the consent of the commission, then the decree must be affirmed, unless it conflicts with appellant's rights under the Constitution of the United States, or Acts of Congress passed in pursuance thereof.

The first point made by appellant is that, under section 10 of the Natural Gas Act, natural gas companies are only required to furnish natural gas "to consumers along their lines and within their respective districts"; and, since the Johnstown Company is not a "consumer," and the consumers in Johnstown are not "along their [appellant's] lines," although "within their respective districts," it has no charter obligation to either, and the termination of the contract between the two companies put an end to all other possible claims upon it. Much might be said in support of the contention that appellant's action in building the spur to a point just outside of Johnstown, and there connecting with the lines of the Johnstown Company, for the sole purpose of supplying consumers in that city (which was within appellant's field of service), in legal effect placed these consumers on appellant's line of service. We prefer, however, to ground our decision upon this point more broadly.

The Public Service Company Law makes no distinction between wholesale and retail service, or between direct and indirect service, or between service which is required and that which is only authorized. On the contrary, it says, in article I, section 1, that "The word 'service' is used in this act in its broadest and most inclusive sense," particularly specifying therein certain things which are to be included within the meaning of the general language used, but not expressly or impliedly excluding any others; and thereafter makes all kinds of service subject to regulation by the commission. When

that law went into effect, appellant and the Johnstown Company were each authorized by charter to serve consumers in Johnstown, the actual service being furnished indirectly by appellant and directly by the Johnstown Company, under an arrangement which was peculiarly within the remedial purpose of the statute, for that plan insured the service and at the same time avoided possible ruinous competition between the two companies, which, if it arose, was certain to result in injury to both of them, and to the public also. Any change in that service, in the way now attempted, would necessarily have the effect of seriously injuring those consumers. To prevent all such wrongs, the commission is given express power to hear and determine, subject to review, all complaints in regard to them: Article VI, sections 6 and 7.

Without further elaboration, we add that we fully agree with the following extracts from the opinion of the Superior Court, in the instant case: "Article I, section 1, of the Public Service Company Law expressly provides that the term 'Public Service Company,' when used in the act, shall include all natural gas companies...... It may be broadly stated that every public service company, while performing any service authorized by its charter, is engaged in public service within the meaning of the Public Service Company Law, and subject to the supervision and regulation of the Public Service Commission, so far as the State may lawfully supervise and regulate its operations,.....that the act is broad enough in its grant of authority to the commission to cover the present situation; the broad general powers given the commission apply to any alteration of territory of production or supply, and are not limited to such only as extend or increase such territory." In order to avoid a possible misunderstanding, we should perhaps add that the power of the Public Service Commission, in respect to this matter, is limited to the regulation of public service companies which intend to continue in business, and it has not the right to determine whether

they shall be permitted to surrender their charter powers and retire from business; the court of common pleas decides this, upon application under the Act of April 9, 1856, P. L. 293: New York and Penna. Railway Co. v. Public Service Commission, 72 Pa. Superior Ct. 523.

As antagonizing our conclusion on the point now being considered, appellant contends that section 5 of the Natural Gas Act, as construed in Germania Refining Co. v. Alum Rock Gas Co., 226 Pa. 433, gives to it the absolute right to curtail its field of service when and as it pleases, and that this has been preserved to it by article III, section 12, of the Public Service Company Law. The second part of this contention cannot possibly be sustained, however. The section referred to provides that "Every public service company shall be entitled to the full enjoyment and exercise of all and every the rights, powers and privileges which it lawfully possesses, or might possess, at the time of the passage of this act, except as herein otherwise expressly provided." Under this last clause, appellant claims that the effect of the word "expressly" is that unless the Public Service Company Law contains a direct reference to and repeal of the particular right, power or privilege, which a public service company had theretofore enjoyed, whether given by a special or general statute, such right, power or privilege must be held to be still existing, and hence that section 5 of the Act of 1885 remains in force, since it is not thus directly referred to and repealed.

The difficulty with this contention is that it would emasculate the statute, is in direct conflict with certain of its provisions, and would make it meaningless so far as relates to service by natural gas companies. Upon this point we cannot do better than to quote again from the opinion of the Superior Court: "We have already pointed out that natural gas companies are expressly included within the public service companies governed by the act. The act provides that all such companies shall 'furnish and maintain such service, including facilities,

as shall in all respects be just, reasonably adequate, and practically sufficient for the accommodation and safety of its patrons, employees and the public, and in conformity with such reasonable regulations or orders as may be made by the commission' (article II, section 1a), and forbids undue or unreasonable discrimination between localities, (article III, section 8b). The terms 'service' and 'facilities' as thus employed in the act are used in their 'broadest and most inclusive sense' (article I, section 1). The act grants power and authority to the commission generally to supervise and regulate all public service companies *doing business* within the Commonwealth (article V, section 1); to determine, specify and order the just, reasonable......and sufficient service, facilities, rules, regulations or practices to be put in force, observed, rendered, used or furnished by public service companies in the performance of their public duties, (article V, section 2), and provides that the enumeration of special powers granted the commission in the act shall not exclude any power possessed by it under its general grant (article V, section 28). It provides that the commission must approve and issue its certificate of public convenience before such public service company can be incorporated, organized or created (article III, section 2a) or begin the exercise of any right, power, franchise or privilege under any ordinance or municipal contract (article III, section 2b). Without the approval of the commission, a public service company may not lawfully renew its charter or obtain any additional rights, powers, franchises or privileges by amendment or supplement to its charter, or otherwise (article III, section 3a); or sell, assign, transfer, lease, consolidate or merge its property, powers, franchises or privileges to or with any other corporation or person (article III, section 3c). In short, the commission's powers of supervision and regulation are of the broadest and most comprehensive character and it is difficult to

conceive of any subject of intrastate service, facilities, or rates not within its scope and authority."

Probably in every special act of assembly, incorporating a public service company prior to the Constitution of 1873, and in many, if not most or all, of the general acts, providing for their incorporation since that date, there will be found granted some "rights, powers or privileges" relating to rates or service. None of these, "particular rights, powers or privileges" are referred to in the Public Service Company Law, although the manner for determining what shall be done in regard to the rates and service of all public service companies, is therein set forth in minute detail, and although also section 51 of the statute provides that "all other acts or parts of acts, inconsistent herewith or supplied hereby, be, and the same are also hereby repealed."

It is unthinkable that the legislature, which was seeking to regulate the rates and service of all such companies, for the benefit of them and of the public alike, should have left wide open the door of escape from the very thing it was so minutely and carefully attempting to accomplish. Such a conclusion is not permissible if some other meaning can reasonably be given to the language now being construed. Happily this is not difficult to do. If the particular words referred to are held to relate to *subjects* "expressly" dealt with in the act, every part of it would become consistent with every other part, and the clause would be interpreted as if it read: "Every public service company shall be entitled to the full enjoyment and exercise of all and every the rights, powers and privileges, which it lawfully possesses, or might possess, at the time of the passage of this act, except as [those matters are] herein otherwise expressly provided" for. This, we decide, is its true construction.

If any other conclusion were reached, the result would be, as the Superior Court well says in its opinion: "If a natural gas company retains the arbitrary power to punish a community which has the hardihood to question

any of its rates, regulations, or practices, by cutting it out of its field of supply and refusing to furnish it any gas at all; if it may evade the orders of the commission relative to its service at a particular place by eliminating that place from its field of operations, the legislature might just as well not have declared such corporations subject to supervision and regulation by the commission. We cannot agree to such a proposition." To this we may add that, if we held otherwise than as here ruled, "the scandals growing out of favored terms being given to friends of the management, would be revived, although it was the intent of the Public Service Company Law to cut up by the roots all such possibilities": Duquesne Light Co. v. Public Service Commission, 273 Pa. 287, 298. As already suggested, the statute is very clearly intended to prevent this; for it says, in article III, section 8, that "It shall be unlawful for any public service company... (b) To make or give any undue or unreasonable preference or advantage in favor of or to...any locality...in any respect whatsoever; or to subject any particular...locality...to any undue or unreasonable prejudice or advantage in any respect whatsoever."

What we have said above leaves open only the federal questions raised, the first of which (slightly referred to in appellant's brief, but not pressed at the oral argument), is that the decrees below violated the due process clause of the 14th Amendment, in that it made no provision for payment to appellant, for the gas actually furnished to the Johnstown Company; and, the second, that it impaired the obligation of the contract between the two companies. As to the former contention, it is sufficient to say that the only reason payment has not been provided for, is because appellant has not chosen to press to a hearing and final determination the questions raised regarding the tariff of rates filed by it in accordance with the permission given in the order appealed from; nor has it asked, as it might have done, for an order for payment or security pending the final decision (Suburban Water Company v. Oakmont Bor-

ough, 268 Pa. 243, 255), but has apparently preferred to depend on the result of an undetermined suit which it has brought against the Johnstown Company. As to the second of those contentions, it is unnecessary to quote the numerous decisions holding that the constitutional provision as to the impairment of contracts does not prevent proper state regulation of the rates and service of public service companies. It may be said, however, that we agree with appellant that there is now no contract to be violated, and add that the decision here made is wholly irrespective of the terms of its former contract with the Johnstown Company.

But we are further told, and upon this great stress is laid, that the gas is in interstate commerce during the entire period of its ownership by appellant, and for this reason cannot be subjected to state regulation until after it has passed, with appellant's consent, into the possession of the Johnstown Company. If this claim is sound, appellant may even refuse, when and as it chooses, to permit gas to pass into the local mains of each and every one of the 78 municipalities it serves, and escape all regulation as to them also, since Congress has not attempted to regulate the distribution of natural gas, and, being in interstate commerce, any and every state attempt so to do must fail. This is a startling proposition; for, while public service companies have always been subject to just and reasonable regulation by the state which charters them, and in which they are to perform the duties and exercise the powers thereby granted, yet, if the present claim be correct, appellant, and all others in like situation, (1) may free themselves from all regulation by the simple device of mingling the gas produced here with that purchased in another state, the combined quantity being needed to enable it to comply with its charter obligations to citizens of this state, (2) may thus discriminate against consumers in such localities as it chooses, and (3), though retaining all the powers granted to it, may escape compliance with

the obligations which were the consideration for the grant. If the Constitution of the United States so provides, of course it must be obeyed, however incongruous and harmful the result may be. The presumptions are all against such a contention, however, and happily it is demonstrably erroneous, so far, at least, as it relates to the present situation.

As already pointed out, the only evidence regarding appellant's acquisition of gas outside of Pennsylvania, is that it was purchased "in West Virginia, at the West Virginia State Line, by meter measurement.' Exactly what this means is not clear, and the burden of making it so was upon appellant, which is seeking thereby to obtain immunity from a just regulation by the state of its incorporation. It certainly can mean no more than that the gas was bought in West Virginia, for delivery at the state line, the quantity to be there ascertained by meter measurement. This being so, the interstate shipment ended at that line, where the parties originally intended it should end, and appellant's only other right, under the interstate commerce clause, was to there sell the article in bulk: Illinois Central R. R. Co. v. Fuentes, 236 U. S. 157, 163; Western Union Telegraph Co. v. Foster, 247 U. S. 105, 113.

No authority suggests, and no principle calls upon us to say, that an entire state is the destination of an article shipped to a point therein, and that a purchaser has the right to carry it far beyond the place where the interstate shipment in fact ended, and sell it in installments, considering it as if still in interstate commerce, in each of 78 different localities. The exemption from state regulation being limited as stated, it necessarily follows, that, under the only contract which we are advised existed as to the gas obtained from the Hope Company, its interstate character ended at the state line and thereafter it was wholly intrastate; and this is, in effect, the principle decided in Gulf, Colorado & Santa Fe Railway Co. v. Texas, 204 U. S. 403; Chicago, Milwaukee &

St. Paul Railway Co. v. State of Iowa, 233 U. S. 334, and the cases in their train.

We need not further elaborate this thought, however, for, whether or not the gas continued in interstate commerce, it was, nevertheless, so far as concerns its distribution in Pennsylvania, subject to the reasonable regulatory power of the state. As was said in Pennsylvania Gas Co. v. Public Service Commission of New York, 252 U. S. 23, 30-31, where admittedly the gas was in interstate commerce: "The rates of gas companies transmitting gas in interstate commerce are not only not regulated by Congress, but the Interstate Commerce Act expressly withholds the subject from federal control, ch. 309, section 7, 36 Stat. at L. 539, 544. The thing which the state commission has undertaken to regulate, while part of an interstate transmission, is local in its nature, and pertains to the furnishing of natural gas to local consumers within the City of Jamestown in the State of New York. The pipes which reach the customers served are supplied with gas directly from the main of the company which brings it into the State; nevertheless the service rendered is essentially local......While the manner in which the business is conducted is part of interstate commerce, its regulation, in the distribution of gas to the local consumers, is required in the public interest, and has not been attempted under the superior authority of Congress......[hence] until the subject-matter is regulated by congressional action, the exercise of authority conferred by the state upon its Public Service Commission is not violative of the commerce clause of the Federal Constitution."

Appellant admits that, under that decision, its distribution of gas to the 78 municipalities it directly serves, is subject to reasonable regulation by the commission; but, denies this as to the service for the benefit of the citizens of Johnstown, as we think illogically, since the general language of the opinion and of the act alike covers all kinds of just and equal regulation. Appellant's

attempted distinction seems to be based upon the use of the words "gate of the city," "local mains," and "burner tips," in certain other decisions under this clause of the federal statute. None of these terms appear, however, in Pennsylvania Gas Co. v. Public Service Commission of New York, supra, possibly because they find no place in the letter or spirit of the act of Congress, but certainly because, if the facts were stated, the decision itself would antagonize the argument attempted to be made from them. That was a rate case, in which the utility was engaged in supplying interstate gas not only to consumers in the City of Jamestown, but also to those in the town of Ellicott and the village of Falconer in the State of New York, as well as to others in the cities of Warren, Corry and Erie in the State of Pennsylvania. In order to decide what would be a fair rate in Jamestown, necessarily the service in the other places, and the proper rates to be charged to consumers therein would also have to be determined. It follows that the regulation could not properly have been limited to a consideration of the rates which would have been required for the gas which passed the "gate of the city" of Jamestown, or entered its "local mains," or was consumed at its "burner tips" only, as would have been the case if that city alone had been served by the natural gas company. Necessarily, therefore, the affirmance of the right of regulation there, carried with it, in principle at least, all that is decided in the present case.

It is only when we carefully read the language of the other opinions, where the words "gate of the city," "local mains" and "burner tips" are used, that we understand their significance as simply stating the place where, in each particular instance, the right of regulation actually began. Such an investigation will also show, however, that none of those authorities even suggest that, under a different state of facts, the right could nevertheless only begin at one or the other of the places named. The instances must be exceedingly rare where a word or phrase

from an opinion will be held to control the meaning of a statute, which, as in the present instance, does not use the word or phrase. When Congress excluded natural gas from the purview of the Interstate Commerce Act, without in any way limiting the exception, it could only have meant that, in matters of distribution, the state's power of equal and just regulation should continue to exist, even though the gas was produced from wells outside the State, and was carried into it in interstate commerce; and, since Congress has not limited the right to retail distribution alone, that the state's power of regulation may justly and properly be applied to all kinds of distribution, in places where the utility was authorized to serve individual consumers, even though, as here, it adopted an indirect method of doing so, because that course benefited it, by enabling it to avoid ruinous competition with a rival corporation, then fully equipped for the service, and having equal rights in the territory.

It is true that in the Jamestown Case, the utility did not seek, as appellant does, to discriminate against all of the consumers in a particular locality, in favor of all those in other places; but this is an unimportant difference. It is inconceivable that Congress should have deliberately left to the states the general power to regulate distribution by natural gas companies, though engaged in interstate commerce, and yet have meant this to be restricted to their dealings with individual consumers, leaving in full force the power, at least equally harmful, to discriminate against all of the users in certain localities. Before regulation began, this great wrong not infrequently resulted from the action of public service companies; destruction of it was one of the purposes for which public service company laws were passed. Of course, Congress could have permitted state regulation as to certain of the evils which existed, and have refused it as to others, though the latter were equally harmful to the public. It has not done so, however; on the contrary, it has left to the states themselves the matter of

making all necessary regulations, subject always to an appeal to the courts. Not otherwise can the intention of Congress in exempting natural gas from the provisions of the Interstate Commerce Act, be given its only reasonable effect. It follows that the place where the gas was found is unimportant; that the power to require appellant to continue this service is unaffected by the question as to whether or not the gas was in interstate commerce when it reached the "gate of the city" of Johnstown; and hence this contention must also be overruled.

The same conclusion is reached when the matter is viewed from another standpoint. If we keep steadily in mind exactly what the subject-matter of this appeal is, it will readily be seen that the orders of the commission, now being considered, could not be held to contravene, directly or indirectly, the interstate commerce clause of the Federal Constitution, even if Congress had not excluded natural gas from the provisions of the Interstate Commerce Act. Appellant is a Pennsylvania corporation, authorized by its charter to supply such gas to the citizens in given localities. Whether it is furnished because of a duty so to do, or because of authority contained in the charter, the citizens are equally interested in receiving it, and the state's only concern is that they shall all be treated alike. For many years appellant has been supplying gas to the Johnstown Company, on what it is pleased to term a wholesale basis, without regard to where the commodity came from. It did this knowing there was no other visible or probable source of supply, and knowing also that the citizens of Johnstown (as in fact was the case) would rearrange their mode of life, and would go to considerable expense in adjusting their homes to the new system. Solely for the purpose of making the connection with the Johnstown Company's pipes, appellant exercised the right of eminent domain given to it by the state, declaring it did so in order that those citizens might receive the gas it had to supply. As already stated, both before and after reaching Johns-

town, it directly served, at retail, the consumers in seventy-five other municipalities. Under such circumstances, it is not unfair to say that the service to the Johnstown Company should be placed in the same class as that to any large retail purchaser, and hence appellant should not be permitted to arbitrarily abandon the service, to the great injury of the citizens who acted on the faith of its continued compliance with the obligations of its charter, solely because it chooses to buy some of the gas produced from wells outside the state. This is especially so since it has ample gas, obtained from wells in the state, to enable it to comply fully with the orders of the commission, and no attempt is being made to deprive it of a full and adequate return for the service. Appellant's claim is, therefore, that it may exercise all the rights given to it by the state, and yet avoid the obligations imposed as a condition of their grant, although, so far as now appears, it is not and cannot be injured by the state's order to file a schedule of rates, and continue its public duties pendente lite. It might, of course, escape compliance, if its interstate business, assuming it has such, would be unduly burdened by the state's requirements. It cannot, however, where, as here, the only effect is to prevent discrimination against certain localities in favor of others, to insure against which possibility appellant is simply required (subject to a later judicial review of all relevant questions of law and fact, whenever it so demands), to submit, to an appropriate tribunal of the state, the question of where, if at all, service may be discontinued. The effect which such a regulation has upon interstate commerce, if indeed it can be said to have any, is as purely incidental as anything can well be conceived to be. If the continued compliance with its duties as defined by the law of the state of its incorporation, might (we do not say it does) indirectly affect a commodity received from outside the state, that is purely a matter of corporate management or control, and is no more beyond the state's power than

would be an order upon a lighting or heating company to comply with its duty of indiscriminate service, though the coal or oil used by it was obtained in another state. In neither event could the utility be heard to say: "We cannot comply with our charter obligations, except by obtaining the fuel in interstate commerce, and if we do you cannot regulate it, and, hence, because of this, you cannot require us to comply with your order." A complete answer is: "We do not say you must obtain fuel in interstate commerce; this you may do or not, as you please; but we do say that you must comply with the requirements of your charter, and serve the public justly and without discrimination, or you must surrender the powers conferred upon you by the State."

The enforcing of a corporation's duty, under such circumstances, affects interstate commerce only indirectly and remotely, and is not forbidden by the Federal Constitution. "Legislation of a state, not directed against commerce or any of its regulations, but relating to the rights, duties and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit": Smith v. Alabama, 124 U. S. 465, 473; Pittsburgh and Southern Coal Co. v. Louisiana, 156 U. S. 590. If the effect of the state's action was to discriminate in any degree against articles in interstate commerce, a far different question would arise. Here, it only prevents discrimination, and this may be done, even to the extent of taxing articles in the state, still in interstate commerce, although the effect of so doing is necessarily to burden that commerce, if it does not do so either unduly or unreasonably. A long line of cases from Woodruff v. Parham, 75 U. S. 123, to Sonneborn Bros. v. Keeling, 262 U. S. 506, so holds; a fortiori, the conclusion must be the same where the effect is

not to burden interstate commerce at all, or even to injuriously affect it in any degree.

The importance of the questions involved, the able differing opinions in the Superior Court, and the learned and elaborate argument of counsel for appellant, must be the excuse for the length of this opinion, which, perhaps, could have been greatly abbreviated had it been limited to the narrow point upon which the decision of the commission was made to turn. As already stated, it has not been decreed that appellant may not be exempted from supplying gas for the benefit of the citizens of Johnstown, while still furnishing it to those in other localities, but only that it must first apply to the Public Service Commission for leave so to do, in order that there may be a public determination as to its rights in this respect. Its contention in effect is, therefore, that although it is a public service company, incorporated by this Commonwealth, and, by virtue of the authority contained in its charter, sinks wells in this state and obtains from them more than enough gas to supply all the consumers in Johnstown, yet no public authority can be allowed to consider its right to discontinue this production and supply, because, and only because, it also purchases gas in other states, under authority of the same charter, and, for convenience in general distribution, mixes the two volumes of gas and carries them in a single pipe line. That is, because it chooses to mingle the two streams of gas, it can, solely, by this act of its own, wholly defeat the state's power of regulation of the gas obtained from wells in the state. This of course cannot be. If it should become necessary to separate the streams, in order to obey the commands of the state, appellant would have to do this, the interstate commerce gas, if it is such, being more than sufficient to supply its consumers in all other places than Johnstown. This also is, therefore, merely a matter of corporate management or control in apportioning the supply. That so doing would result in making its present rates inadequate, is not a matter with

which we are now concerned; it can only arise when a new tariff is filed.

The other contentions made by the parties have not been overlooked, but they have become unimportant in view of our conclusions above stated. In order to avoid misapprehension, however, we should add that we do not decide that the order complained of is so far final as to be the proper basis for an appeal. If we had quashed the appeal for this reason, as it was argued we should do, the only effect would have been to postpone, until after final decree, the consideration of the questions herein decided. Hence, since we agree with appellee on the merits, and are admonished by the fundamental law that litigants are entitled to "justice without......delay," we have deemed it best to shorten, as far as may be, future proceedings in this long-drawn-out litigation.

The decrees of the Superior Court are affirmed and the appeals are dismissed at the cost of appellant.