## Borough of Johnsonburg, Appellant, v. The Public Service Commission.

Argued October 4, 1929.

Be-fore Porter, P. J., Trexler, Keller, Linn, Gawthrop, Cunningham and Baldrige, JJ.

*Thomas Raeburn White*, and with him *H. C. Roberts* and *J. L. Trambley*, for appellant.—Where a public utility company purchases a commodity such as gas for distribution to the public, from another company with which it is affiliated, or which is owned by the same interests, it cannot justify a rate charged to the public without also justifying the rate which it pays for such commodity, in the same manner and by the

same character of evidence necessary to justify the rate charged to the public: City of Reading v. Reading Transit & Light Company, P. U. R. 1922A, 346; Re Fort Worth Gas Co., P. U. R. 1929A, 136; Re Point Pleasant Natural Gas Company, P. U. R. 1927B, 805; Re West Union Gas Co., P. U. R. 1922A, 657; Hermann v. Newtown Gas Co., P. U. R. 1916D, 825; Clarksburg Light & Heat Co., P. U. R. 1917A, 577; Logan Gas Company, P. U. R. 1929A, 232.

*E. Everett Mather, Jr.,* Assistant Counsel, and with him *Daniel H. Kunkel* and *John Fox Weiss,* Counsel for The Public Service Commission.—When a public service company deals with its stockholders or with other companies closely affiliated with it, the situation requires close scrutiny on the part of the regulatory authorities, but if the prices paid and charged as operating expenses are shown to be reasonable, the authorities are not justified in going beyond the price paid and examining the profit obtained by the affiliated company: Houston v. Southwestern Bell Telephone Company, 259 U. S. 318; Southwestern Bell Telephone Company v. Commission, 262 U. S. 276; Erie City et al. v. Commission, 278 Pa. 512; Coffeyville Gas & Fuel Company v. P. U. C., 225 Pac. 1036.

There is no evidence that the appellee's rates are higher than the service is worth to the consumers: City of Philadelphia et al. v. Public Service Commission, 83 Pa. Superior Ct. 8.

*J. E. Mullin,* for intervening appellee.—Dealings of the company were fair and reasonable: Ambridge Borough v. Philadelphia Co., 283 Pa. 5; Winfield v. Wichita Natural Gas Co., 267 Fed. 47; Hutchinson Gas & Fuel Co. v. Wichita Natural Gas Co., 267 Fed. 35.

To fix the rate at less than the general market price or value of the gas in the open market would be to take property without just compensation: United

States v. New River Collieries Company, 262 U. S. 341, 67 L. Ed. 1014; L. Vogelstein & Company, Inc. v. United States, 262 U. S. 337, 67 L. Ed. 1012.

OPINION BY LINN, J., January 29, 1930:

The Borough of Johnsonburg appeals from an order of the commission dismissing its complaint against retail gas rates filed by Consumers Gas & Heat Company (hereafter called Consumers Company) to be collected from residents of the borough. The tariff was filed in December, 1924, to become effective January 8, 1925; the complaint was filed before that date; the burden of proving that the rate was reasonable was therefore on Consumers Company, the intervening appellee. Hearings were had and the rate was sustained.

Section 24, Article VI of the Act (1913, P. L. 1427) provides that if this court should "find that the order appealed from is unreasonable or based upon incompetent evidence materially affecting the determination or order of the commission, or if otherwise not in conformity with law, it may enter a final decree reversing the order of the commission, or, in its discretion, it may remand the record to the commission with directions to reconsider the matter and make such order as shall be reasonable and in conformity with law." Whether the record shows that the challenged rate is reasonable is a question of law. In the peculiar circumstances of this case, we have concluded that the evidence is insufficient, the order not in conformity with law and that we must remand the record to enable the commission to take additional evidence if the parties have any to offer, and to reconsider the matter.

The Consumers Gas and Heat Company was incorporated in 1890 under the Act of May 29, 1885, P. L. 29, for the production and distribution of natural gas, and until 1920, not only distributed gas to local customers in the Borough of Johnsonburg but also pro-

duced from land owned and leased by it the gas it sold. In 1920, its gas producing lands, leases and wholesale distributing equipment were sold to the Midland Gas Company, hereafter called Midland. The commission granted a certificate of public convenience approving the sale. The report of the commission in the case now before us states that the Consumers Company "and the Midland Gas Company were under common ownership and control at the time of the sale, the owners of the stock in each company being practically identical both in personality and in the proportionate shares owned." An agreement by Consumers Company and Midland was made at the time of the sale providing that Midland would sell to Consumers Company for a term of 5 years from January 1, 1920, all the natural gas produced on the land sold by Consumers Company to Midland, if needed, at "a price equal to 75 per centum of the prevailing price in places supplied by the Consumers Company as established by the commission."

The new tariff increased the rates to patrons in Johnsonburg from 48 to 68 cents per thousand cubic feet, with a discount of 3 cents per thousand for prompt payment. This is the rate complained of and it is with regard to the proof of the reasonableness of the rate that we consider it necessary to take additional evidence if the rate is to be sustained.

Much the largest element in the operating expenses of Consumers Company, and therefore an important subject of inquiry in the investigation into the reasonableness of the rate to be charged, is the wholesale price to be paid by Consumers Company for gas, which was fixed at 45 cents per thousand by its vendor. The effect of the increase in the rate, as stated by the commission, has been to reduce the number of consumers in the borough from 898 in 1924 to 730 in 1927; gas consumption fell from 130,354 thousand cubic feet in

1924 to 78,712 thousand for the year ending October, 1927; gross revenues fell from $58,988 in 1924 to $51,955 for the year ending October 31, 1927, under the new tariff.

The record contains the following statement of the price received by Consumers Company per thousand cubic feet from 1922 to 1926;

|  | Gross | Discount |
|---|---|---|
| 1922—Entire year ................. | 38c | 3c |
| 1923—January 1st to December 15th .. | 38c | 3c |
|     December 15th to December 31st | 48c | 3c |
| 1924—Entire year ................. | 48c | 3c |
| 1925—January 1st to January 15th ... | 48c | 3c |
|     January 15th to December 15th | 68c | 3c |
| 1926—Entire year ................. | 68c | 3c |

The wholesale prices per thousand feet paid by Consumers Company during that period were as follows:

| 1922 ................................. | 26¼c |
|---|---|
| 1923—Part of year ..................... | 26½c |
|    "  "  " ..................... | 33¾c |
| 1924—Part of year ..................... | 26½c |
|    "  "  " ..................... | 32½c |
|    "  "  " ..................... | 45c |

(as to 5335 M. feet billed to Hanley & Bird for December, 1924)

| 1925—Part of year ..................... | 32½c |
|---|---|
|    "  "  " ..................... | 45c |
| 1926   "  "  " ..................... | 45c |

During the 5 years, from 1920 to 1925, Consumers Company and Midland, as the commission has found, "were under common ownership and control." These owners were Shaw, Crawford and Miller. We shall assume for present purposes that the arrangement made by them as managers of one company with themselves as managers of the other company, for supplying gas to be sold by Midland to Consumers Company

at the wholesale rates charged during that period were reasonable. To sustain the burden of proof that 68 cents was a reasonable retail rate in the circumstances disclosed in this record, it was necessary for Consumers Company to show that the 45 cents wholesale rate thereafter to be paid by it was a reasonable sum to pay, because, of course, in considering the greatly increased operating expense, the large increase in the wholesale cost of the product to be distributed by Consumers Company lay at the heart of the dispute. That Consumers Company understood that it must make such proof is clear, because, to justify its payment, it offered evidence that 45 cents was a prevailing wholesale price for gas in the community.

Appellant's claim made below, and here, was thus stated and put aside in the report of the commission: "Respondent's [Consumers Company] claim for operating expenses amounts to $51,469. Complainant's [appellant's] attack thereon is centered around the wholesale price paid for gas by respondent to a partnership trading under the name of Hanley and Bird of Bradford ......... Hanley and Bird increased the sale price of wholesale gas from thirty-two and a half to forty-five cents per thousand cubic feet. Complainant contends that the reasonableness of the forty-five cent wholesale rate cannot be determined except by a valuation of the vendor's property. Respondent, however, presented testimony of witnesses concerning wholesale rates in the general vicinity in which it operates, that tend to support this wholesale rate. From a consideration of the foregoing facts and conclusions, it will be noted that the gross revenue of approximately $52,000 which it is estimated will be produced by the new tariff, is almost entirely absorbed by the operating expenses of the company, leaving only a small margin for fair return and depreciation upon the property used and useful in the public service."

While we cannot sustain appellant's contention that the case requires a valuation of Hanley and Bird's property, we agree that the evidence is not sufficient when considered, as it must be, with other facts in the case to be mentioned, to sustain the conclusion of the commission. It can be deemed sufficient only by making an assumption which this court is not justified in making, that is, an assumption of the legality of other conduct of the Midland Company and of the owners of both companies—Shaw, Crawford and Miller,—in essential matters connected with the increase in the wholesale rate. In effect, these three men—acting as Midland—increased the wholesale rate to be paid by them as Consumers Company for the product to be sold at retail, Consumers Company passing on to its patrons the increased cost. There is no evidence that Midland filed a tariff increasing its wholesale rate to 45 cents. The brief of the commission states that Midland is a natural gas company formed under the natural gas Act of 1885, supra; it is therefore a public service company subject to the statute. A public service company, even if engaged in wholesale service only, must file a tariff: see Franke v. Johnstown Fuel Supply Co., 70 Pa. Superior Ct. 446; Peoples Nat. Gas Co. v. Com., 79 Pa. Superior Ct. 560, 577, etc., and 279 Pa. 252. In view of the relations which the companies bore to each other, and of the common management, we cannot rely on a presumption that Midland complied with the law by filing a tariff; it was the duty of Consumers Company to show the fact in proving that its new rate was reasonable.

The close association and the common management of the two companies urgently required particular scrutiny by the commission into the conditions in which Midland made the increase in the wholesale rate, not only because of the common ownership and management, but also because a few months before, (Oct. 23,

1924) Shaw, Crawford and Miller, the common owners of the corporate stocks, granted an option to Hanley and Bird, a partnership, to purchase "all the property, real, personal and mixed of the Midland Gas Company," which included the producing properties on which Consumers Company depended for its supply. Their option was exercised and was followed by a supplementary contract of November 20, 1924, between the same parties containing the following provision: "The parties of the second part [Hanley and Bird] shall not take over or assume the contract [containing the wholesale gas provision quoted above] with the Consumers Gas and Heat Company for a period longer than May 1, 1925, and from December 1, 1924, to May 1, 1925, the price of the gas under said contract shall be thirty-two and one-half cents (32½c) per thousand cubic feet." Before the 68 cent tariff was filed by Consumers Company, we then have the parties who control both corporations, dealing with a partnership (which counsel for Consumers Company says is not subject to the Public Service Company Law) and agreeing among themselves on an increased wholesale rate increasing the operating expenses of Consumers Company. It is also a fact that by supplemental negotiation, Shaw and his associates sold or agreed to sell the capital stock of Consumers Company, or to cause the property of Consumers Company to be sold to Hanley and Bird as part of the transaction covered by the agreements of October 24 and November 20 already mentioned. The record is not at all clear whether Hanley and Bird were buying the capital stock of Consumers Company or its property. Part of the contract is in letters. In one of them Crawford writes to Hanley and Bird: "In addition to all of the physical property [presumably the property of Midland] conveyed by the agreement mentioned above, quantity of which you now thoroughly understand, we will cause

to be sold to you the property of the Consumers Gas and Heat Company at Johnsonburg ...... In addition we agree to have the approval of the Public Service Commission to the sale and also, if it is necessary, to conduct as your agents the rate case at Johnsonburg.'' The letter from which those quotations are made is the subject of a stipulation signed by the parties containing the following: ''The letter of April 18, 1925, which has been offered in evidence, sets forth in effect that all of the property of the Consumers. Gas & Heat Company is included in the sale of certain property which had been previously negotiated by Messrs. Crawford, Miller and Shaw. Mr. Bird stated his recollection to be that the transfer of this property was agreed upon as a settlement of certain disputes which had arisen concerning the subject matter of the contract above referred to. Mr. Bird said that the acreage mentioned in the agreement was short, and there were other provisions which they felt gave them less than had been agreed to be transferred, consequently, the matter was settled by the letter of April 18th, in which Mr. Crawford agreed in addition to transfer all of the property of the Consumers Gas & Heat Company, but no separate price or consideration was placed upon that property.'' They also agreed that: ''Upon full payment of the consideration of the contract, the stock of the Consumers Gas and Heat Company will be turned over to Messrs. Hanley and Bird.'' Mr. Bird testified:

''Q. And in order to adjust those differences they agreed to transfer to you without additional consideration the property of the Consumers Gas & Heat Company?

''A. Exactly.

''Q. And as I understood you to say a few minutes ago, when this contract was completed by the final pay-

ment, the stock, as well is to be delivered along with the property?

"A. Well, I am not prepared to answer that. That is a matter you will have to take up with Mr. Crawford.

"Q. At any rate, all of the property is to go to you?

"A. All of the property."

Hanley and Bird went into possession and operation of the Consumers Gas & Heat Company, or of its property, "at the date of that letter [April 18, 1925] or shortly after that." The books of the company were delivered to Hanley and Bird May 29, 1925. But as late as 1927 (as appears in part of the record not printed) the capital stock of the Consumers Company was still registered in the names of Shaw and others and not in Hanley and Bird, though notwithstanding that, the report of the commission says: "This partnership became the owner of respondent's capital stock in April, 1925, following the effective date of the new tariff in January, 1925." In the report of the commission it is stated that "Hanley and Bird increased the sale price of wholesale gas from 32½ cents to 45 cents per thousand cubic feet." When Consumers Company in November,1924, decided to increase its rate to 68 cents, the persons in control of both corporations, Shaw, Crawford and Miller, of course knew that they (Consumers Company) were then paying only 32½ cents wholesale. The record shows nothing as of November and December, 1924, to justify their charging 68 cents retail while the wholesale price was less than half that rate; they knew that 68 cent rate would be too high without some corresponding increase in operating expenses,—and there is no evidence of any other large increase in operating cost. We must assume for present purposes (and subsequent events show that the assumptions are facts) that the parties in December, 1924, in control of Midland, had then de-

termined to increase the wholesale price of gas, and that their transactions with Hanley and Bird involved making that increase, and that the increase was made to aid in accomplishing the general purposes of the five men, to transfer the property of both companies or the property of one and the capital stock of the other, with the result that Consumers Company was asked to pay 45 cents a thousand instead of 32½ cents theretofore paid. There is no evidence that the commission ever approved the action of Shaw, Crawford and Miller, in causing Midland to divest itself (if it did) of the only gas producing properties that would enable it to supply gas to Consumers Company for local distribution by selling them to Hanley and Bird. The record states that Hanley and Bird have been in possession and operating the properties since May, 1925. We cannot assume that approval by the commission was obtained, because that fact—if it be a fact—is to be proved, in the circumstances of this case, by those who rely on the legality of the rate structure to which they say they must conform in paying the increased wholesale rate. It may be that Shaw and his associates in agreeing to "have the approval of the Public Service Commission to the sale ......" intended to apply for that approval after Hanley and Bird had completed paying for the property, meanwhile permitting them to take possession and conduct their operations.

Article III, Sec. 3, of the Public Service Company Law, (1913, P. L. 1388), provides "Upon like approval of the commission first had and obtained, as aforesaid, and upon compliance with existing laws, and not otherwise, it shall be lawful ...... (c.) for any public service company to sell, assign, transfer, lease, consolidate, or merge its property, powers, franchises, or privileges, or any of them, to or with any other corporation or person." Article V, Sec. 18, 19 (P. L. 1414) pro-

vide for hearings on such application and that "such approval ...... shall be given only if and when the said commission shall find or determine that the granting or approval of such application is necessary or proper for the service, accommodation, convenience, or safety of the public." If this Midland's gas producing property or the Consumers Company's retail distribution system was sold, assigned or transferred to Hanley and Bird in 1924 without the approval of the commission, and has since been operated by Hanley and Bird, that transfer and operation were unlawful because the act requires that approval of the commission must be "first had and obtained." In Peoples Nat. Gas Co. v. Commission, 79 Pa. Superior Ct. 560 and 279 Pa. 252, it was held that the Peoples Company which had been supplying gas at wholesale to a distributing company, the Johnstown Gas Company, for distribution in the City of Johnstown, could not in accordance with the authority conferred by Sec. 5 of the Natural Gas Act of 1885, supra, cease to render service to the City of Johnstown and exclude the city from its territory of supply. It was held that though the power to exclude was conferred by Sec. 5 of the act under which it was incorporated, the Public Service Company Law had so far modified its powers under the act of its incorporation that it could not withdraw its service in that district without first obtaining a certificate of public convenience; it was accordingly required to continue rendering service.

The relations of Consumers Company to its public service may be examined in three periods, (1) up to January 1, 1920; (2) from 1920 to January 1, 1925; (3) after January, 1925.

1. For nearly 30 years prior to January, 1920, it owned and profitably operated its own producing properties and distribution equipment, and was independent. The rule for the calculation of the reasonable rate

that such company, owning both producing and distributing property, may charge, has been established; (cf. Pennsylvania Gas Co. v. P. S. C., 81 Pa. Superior Ct. 65, and 278 Pa. 512; United Gas Co. v. Com., 278 U. S. 300).

2.  In January, 1920, the Midland Gas Company appears in the problem for the first time, and Consumers Company severs itself from its own source of supply by the sale of its producing property and equipment to Midland. Now, while the proper application of rules of rate regulation just referred to, when applied to both companies, would still arrive at the same retail rate to be charged as would be reached for the single company involved during the first period, the calculation itself would be complex because the rights, duties and property of two corporations instead of one would be elements in the problem. But there should be no difference in the character of the public service rendered to the ultimate retail patron, or in the retail rate to be charged; the only difference as to the men owning and operating both companies would be one of bookkeeping resulting from the division of their accounts between the retail distribution on the one hand and the wholesale production on the other; and both would still be operating subject to the regulatory jurisdiction of the commission, a matter of essential importance to residents of the borough who were patrons of the company.

3.  In the evidence of the transition from the second to the third period there is such confusion and uncertainty, as has already been indicated, that the record does not make clear exactly what occurred or, that it was lawful. If there was no approval by the commission of the transfer to Hanley and Bird, the wholesale price will be subject to the same inquiry that would be made, if they were not operating as owners.

Another matter of significance requires explanation by Consumers Company: In December, 1924, during

the 5-year period when it was entitled to receive gas from Midland at 75% of Consumers Company's retail price, but not exceeding 32½ cents, it paid 45 cents to Hanley and Bird. As the exhibit in which this appears designates it as a collection from "field consumers," it may be that it was not a purchase of gas for retail distribution in the borough; but a relevant inquiry then may be, what was the relationship of Hanley and Bird to Consumers Company in December, 1924, as indicated by that transaction and the consequences of it, if any, reflected in the rate increase. We of course do not now characterize the conduct of those in charge of both companies, or of Hanley and Bird, throughout all these transactions as right or wrong, we merely call attention to these uncertainties as they appear on the record and suggest that they are among the essential matters for further explanation and consideration in determining whether Consumers Company has sustained the burden of proof.

Another fact that militates against the position of Consumers Company without explanation—and none appears—is that while the contract of sale by Shaw et al. to Hanley and Bird provides that Hanley and Bird shall not charge Consumers Company more than 32½ cents wholesale for the period ending May 1st, Midland actually collected from Consumers Company 45 cents for part of the gas distributed between January 1, 1925, to April 1, 1925. Some explanation would seem necessary to show why Shaw et al. (as Consumers Company) increased their operating expenses during that period from 32½ cents to 48 cents by buying from themselves (as Midland) after they had stipulated that Hanley and Bird should sell at 32½ cents until May 1, 1925. Was their stipulation not their own assertion that 32½ cents was a reasonable wholesale rate during that period, and a cogent argument

against the reasonableness of the 68 cents retail rate when the tariff was filed in December, 1924?

In his brief the learned counsel for the intervening appellee insists that there is "no basis for the claim that Hanley and Bird and the Consumers Company must be treated as one and the same in this case. Their dealings were fair and reasonable." We understand that the opposing contention is, that for the purpose of sustaining the burden of proof, Consumers Company and Midland are a unit composed of Shaw, Crawford and Miller, who at once control both companies; that in their transactions with Hanley and Bird, certificates of public convenience should have been obtained pursuant to the Public Service Company Law (Art. III, Sec. 3 (c.), Art. V, Sec. 18, 19) and that there is no evidence that they were; that the conduct of the parties already referred to, if unexplained, is not consistent with fair dealing and good faith in the circumstances and is not in harmony with the Public Service Company Law, and that a finding that the rate was reasonable in the absence of satisfactory explanation of those matters cannot be sustained as matter of law. We agree that contention is sound. In Southwestern Bell Telephone Co. v. P. S. C. of Mo., 262 U. S. 276, 280 (cited by intervening appellee), sums paid by a subsidiary to a parent company were allowed but the court said in considering the point that "There is nothing to indicate bad faith." See also Houston v. Southwestern Tel. Co., 259 U. S. 318, 323. In the case before us, the evidence in its present form will support a finding that good faith was lacking. In United States Gas Co. v. R. R. Com., 278 U. S. 300, the courts of first instance and on appeal considered the parent company and its subsidiary as a unit; see page 310. Consumers Company and Midland, acting through the common owners, Shaw, Crawford and Miller, were likewise a unit in dealing with the retail and the whole-

sale rate situations when the tariff in dispute was filed; so treating them on this record is not inconsistent with the rule that recognizes the distinction between a corporation and its stockholders. In view of what has been said it is unnecessary to refer to appellant's citations of decisions of commissions of other states.[1]

In the brief filed by the commission, it is contended that by proof that 45 cents is a wholesale rate paid in the community, Consumers Company brought itself within cases which hold that in such circumstances it is immaterial if the retailing company purchases from an allied wholesale company in good faith. That conclusion would perhaps not be seriously questioned if there were evidence that Midland had filed a 45 cents tariff which had matured into a prima facie lawful rate and had thus become the basis of the increased retail rate of Consumers Company, but it is precisely the absence of such action by Midland, followed by its attempted sale of its property and the other matters already referred to that require us to return the record for further consideration.

The order of the commission is reversed and the record is remanded for consideration by the commission according to law.

Note 1. The subject of intercorporate relations of such companies will be found considered with reference to such decisions in Chap. 50 of Spurr's Vol. 2, Guiding Principles of Public Service Regulations, p. 670, entitled "Reasonableness of Payments to Other Companies for Service or Commodities." And see re Point Pleasant Gas Co., W. Va. Com. P. U. R. 1927 B. 805, 815; re Fort Worth Gas Co., Texas R. R. Com., P. U. R. 1929 A. 136, 139.