**Incorporators of Service Gas Company, Appellant, *v.* Public Service Commission et al.**

382

Argued October 19, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, JAMES and RHODES, JJ.

*Robert T. McCracken*, of *Montgomery & McCracken*, with him *James S. Berger, Fred C. Fernald* and *Berne H. Evans*, of *Hause, Evans, Storey & Lick*, for appellants.

*Samuel Graff Miller*, with him *Harry H. Frank, John C. Kelley* and *Richard J. Beamish*, for appellee, Public Service Commission.

*George Ross Hull,* of *Snyder, Hull, Hull & Leiby,* with him *James C. Forsyth,* of *Wherry, Condon & Forsyth, G. Mason Owlett* and *W. F. Du Bois,* for intervening appellee.

*J. Smith Christy,* of *Weil, Christy & Weil,* with him *David E. Mitchell,* for intervening appellee.

*W. Pitt Gifford,* of *Gunnison, Fish, Gifford & Chapin,* for intervening appellees.

OPINION BY RHODES, J., March 16, 1937:

Application was made to the Public Service Commission for approval of the incorporation of the Service Gas Company and for a Certificate of Public Convenience authorizing it to begin the exercise of its charter rights, powers, and privileges. Protests were filed by the North Penn Gas Company, United Natural Gas Company, Smethport Natural Gas Company, and Manufacturers Gas Company. Extended hearings were held, after which the commission dismissed application on the ground that its approval was neither necessary nor proper for the safety, accommodation, or convenience of the public. The incorporators of the Service Gas Company, the proposed public service company, have appealed.

The order of the commission is prima facie evidence of the facts found, and the burden of proving the contrary rests on the appellants. Article VI, §23, of the Public Service Company Law of July 26, 1913, P. L. 1374, as amended by the Act of June 12, 1931, P. L. 530, §2 (66 PS §837). We have frequently stated that it is an established principle in our practice on appeals, from such administrative orders as the commission is empowered and authorized to make, not to reverse unless the order appealed from is clearly unreasonable or not in conformity with law. *Collins et*

*al. v. P. S. C.,* 84 Pa. Superior Ct. 58; *R. F. Cage et al. v. P. S. C.,* 125 Pa. Superior Ct. 330, 189 A. 896. "We confine ourselves to the question whether the commission acted within its powers and jurisdiction, and do not undertake to pass upon the expediency or wisdom of the order, if there was sufficient competent evidence to justify the action of the commission: *York Express Co. v. P. S. C.,* 110 Pa. Superior Ct. 197, 168 A. 327, and *P. P. & L. Co. v. P. S. C. et al.,* 112 Pa. Superior Ct. 500, 171 A. 412": *Motor Freight Express and Hall's Motor Transit Co., Inc., v. P. S. C.,* 117 Pa. Superior Ct. 174, at pages 177, 178, 177 A. 493, at page 494. The Public Service Company Law (66 PS §1) defines the term "public service company," when used in the act, as including natural gas corporations. Section 18, article 5, of the Public Service Company Law (66 PS §681) provides: "When application shall be made to the commission by any proposed public service company for the approval by said commission of its incorporation, or organization, or creation ...... such approval, in each and every such case, or kind of application, shall be given only if and when the said commission shall find or determine that the granting or approval of such application is necessary or proper for the service, accommodation, convenience, or safety of the public."

Gas companies, both natural and artificial, have been placed under the regulation, supervision, and control of the commission. As in the case of other utilities, the power to regulate natural gas companies includes the power to prevent competition found to be inimical to the public interest. See *Relief Electric Light, Heat and Power Company's Petition,* 63 Pa. Superior Ct. 1. It is within the administrative discretion of the commission, in order to accomplish this purpose, to restrain competition in the distribution and service of natural gas by public service companies. The commission does

not, however, have unlimited discretion; its acts are subject to judicial review, and its findings and final order must have a substantial basis in the testimony.

A natural gas company, being governed by the Public Service Company Law, is obliged to "furnish and maintain such service, including facilities, as shall in all respects be just, reasonably adequate, and practically sufficient for the accommodation and safety of its patrons, employees, and the public, and in conformity with such reasonable regulations or orders as may be made by the commission": Article 2, §1 (a), The Public Service Company Law (66 PS §21). See *Peoples Natural Gas Co. v. P. S. C.*, 279 Pa. 252, 123 A. 799, affirming 79 Pa. Superior Ct. 560. Such utility cannot adequately serve unless it receives sufficient revenue to meet its operating expense, to provide for depreciation and reserve, and to permit a fair return on its investment. The former cannot be expected when the latter is made impossible by unfair competition.

Previously to 1930, in northern Pennsylvania, which is the territory covered by the proposed charter, natural gas was produced from shallow wells. In that year the North Penn Gas Company completed a discovery well in Farmington Township, Tioga County, which was the first production of natural gas in important commercial quantities, in Pennsylvania, from what is known as the Oriskany sand, found at depths of 4,000 feet or more. Subsequently, five other fields of Oriskany production were developed in Tioga and Potter Counties. The names of these fields and the dates of their discovery are, respectively: The Hebron pool, November, 1931; the State Line pool, 1933; the Ellisburg pool, September, 1933; the Harrison pool, June or July, 1934; and the Sabinsville pool, May or June, 1935. The characteristics of the gas found in the Oriskany sand are an initially high rock pressure and large open flow, some of the wells having a daily production of 30,000,000

cubic feet. The sand is porous with the result that the gas is migratory. The amount of gas remaining in these pools is in approximately the same ratio as the present rock pressure bears to the original rock pressure; for example, in the Hebron pool the rock pressure was originally 2,100 pounds, and at the time of the hearing was 450 pounds, indicating that approximately three-fourths of the gas had been withdrawn from that pool. The rock pressures of the Harrison and Sabinsville pools, as of the time of the hearing, remained virtually unchanged from the original pressure of 2,100 pounds, indicating that very little gas had been removed from them. In the original Tioga field the original rock pressure of 1,650 pounds has been reduced to 200 pounds, in the Ellisburg pool from 2,150 pounds to 1,450 pounds, and the State Line pool from 2,000 pounds to 1,800 pounds. In most of these fields the removal of 17,000,-000 to 19,000,000 cubic feet of gas results in a drop of one pound in the pressure.

Godfrey L. Cabot, Inc., a Massachusetts corporation, hereinafter referred to as "Cabot," came into this territory in 1934, and, beginning June 11th of that year, acquired some gas and oil lands in fee, as well as a large number of leases of land, from which it hoped to produce gas and oil. From June 11, 1934, until December 18, 1934, Cabot was doing business in Pennsylvania without a certificate of authority, as required by the Business Corporation Law of May 5, 1933, P. L. 364 (15 PS §2852-1 et seq.). The certificate which it acquired on December 18, 1934, under said act, provided that the powers enumerated should not be construed to authorize the corporation to engage in the business of transporting gas, except for use in its own operations, and the power to sell gas was therein expressly limited to the sale of such gas at the mouth of the well or place of production under private contract and at wholesale only. The certificate further provided that Cabot should

388

not engage in any public service business within the meaning of the Public Service Company Law. Between January, 1935, and January, 1936, Cabot drilled four wells at various locations in the acreage it had acquired, all of which proved to be "dry holes," meaning that the wells were not productive. At the time of the hearing Cabot owned no producing wells in this state of its own discovery. In July, 1935, at which time it had no producing wells in Pennsylvania, Cabot made a contract for the supply of natural gas to the Sinclair Refining Company at its plant in Wellsville, New York. In September of that year Cabot contracted with the Williamsport Natural Gas Company for the gas which it was obligated to deliver to the Sinclair Refining Company. A pipe line was laid from the Ellisburg pool, wherein was located the well of the Williamsport Natural Gas Company, extending as far as the state line in Pennsylvania, connecting there with other lines in New York in order to supply the Sinclair Company. Beginning in November, 1935, Cabot solicited actively industrial consumers in the territory served by the protestants. As a result of such solicitation, contracts were made for the supply of natural gas to the Genesee Chemical Company, located in Genesee, Potter County, on November 15, 1935; the Hanley Company, located at Lewis Run, McKean County, on December 9, 1935; and the Kendall Refining Company, of Bradford, McKean County, on January 9, 1936. The Genesee Chemical Company was then being supplied with gas by the North Penn Gas Company. The Hanley Company and the Kendall Refining Company are customers of the Manufacturers Gas Company.

In December, 1935, Cabot laid a spur pipe line off the main line, previously referred to, a distance of 3 miles for the purpose of connecting with the plant of the Genesee Chemical Company in accordance with its contract. At this point Cabot's attempt to supply natural

gas, in violation of its certificate, was halted by an injunction granted by the Court of Common Pleas of Potter County; and a complaint was filed with the Public Service Commission.

Between January 25 and 29, 1936, Cabot acquired by purchase 3 wells, having an open flow of 25,000,000 cubic feet per day, 2 of which are in the Hebron pool, and 1 in the Ellisburg pool. The well of the Williamsport Natural Gas Company, with which Cabot contracted for an unlimited supply of gas in September, 1935, as above mentioned, is also in the Ellisburg pool, and has an open flow of 30,000,000 cubic feet per day.

On January 24, 1936, the present application was filed with the Public Service Commission wherein the proposed incorporation of the Service Gas Company was set forth and the issuance of a certificate of public convenience to Service Gas Company requested. The purpose of the proposed corporation is to produce, deal in, transport, store, and supply natural gas. The amount of its capital stock is $25,000, and $2,500 has been paid in cash to the treasurer of the proposed corporation, Thomas D. Cabot, of Weston, Mass. All of the capital stock will ultimately be owned by Cabot, and the only property now possessed by the proposed corporation is the $2,500 paid in on the capital stock. The application for charter of the Service Gas Company provides for the service of natural gas in the following townships in Pennsylvania: Genesee, Allegany, Oswayo, Harrison, Ulysses, Bingham, Hebron, West Branch, Summit, Pike, Sweden, and Sharon in Potter County; Westfield, Clymer, and Elkland in Tioga County; Ceres, Eldred, Otto, Foster, Bradford, Keating, and Lafayette in McKean County.

The North Penn Gas Company serves the following townships named in appellants' application, to wit: Genesee, Allegany, Oswayo, Harrison, Ulysses, Bingham, Hebron, Pike, and Sharon in Potter County; the

3 townships in Tioga County named in appellants' application; and Ceres, Eldred, and Keating in McKean County. It has a large number of shallow wells, and also has several wells of Oriskany production in the Hebron, Harrison, and Sabinsville pools in addition to gas supplied by 10 or 15 independent producers.

The United Natural Gas Company serves Genesee, Allegany, and Hebron Townships in Potter County, and Eldred, Otto, Foster, Bradford, Keating, and Lafayette Townships in McKean County. It has no wells in the Oriskany fields, but obtains gas from that source by purchase from other producers. It obtains gas from approximately 2,300 shallow wells, and augments its supply by gas purchase contracts with private operators.

The Smethport Gas Company serves the borough of Smethport and the adjacent or neighboring portions of Keating Township in McKean County with natural gas.

The Manufacturers Gas Company serves the city of Bradford, and adjacent territory in McKean County. It has no wells in the Oriskany fields, and acquires 60 per cent of its supply of natural gas from other producers and the remainder from a number of small or shallow wells. The present application does not include the city of Bradford, and Cabot's contract with the Kendall Company provides that the latter company, which is located within the city, shall take delivery outside the city limits.

Thus it appears that 19 of the 22 townships named in appellants' application are now served by at least one of the protesting companies.

We have carefully examined the evidence, and are convinced that the order of the commission is reasonable and in conformity with law. The essential findings of the commission are supported by competent testimony and warrant and support the commission's order. Appellants had the burden of establishing that the ap-

proval of their application was necessary or proper for the service, accommodation, convenience, or safety of the public. The record discloses no inadequacy of service in the territories served by the respective protestants and included in appellants' application. There is no testimony upon which such a finding could be based; and, on the contrary, the testimony of appellants and the protesting companies was consistently to the effect that they knew of no one in the territory in question who had demanded gas and was unable to secure it. The testimony produced by the protestants was sufficient to show the adequacy of the present service in the territory which appellants seek to supply. The reasonableness of the existing rates charged by the protesting companies was not being questioned in this proceeding. Appellants' counsel stated that they were not attacking the rates of the protestants, and that their rates might be perfectly proper in so far as they knew.

Another phase of the matter to which the commission gave consideration was the supply of gas available to appellants. They own no wells and have no gas purchase contracts. These are the property of Cabot. Service Gas Company would be dependent for its supply upon Cabot and such other producers as may be willing to sell gas to it. The Cabot wells are all in the Oriskany fields; and Thomas D. Cabot, a witness for appellants, testified that these fields "will become exhausted rapidly, probably at the present rate of take in about four years." Appellants' supply as it exists at present is limited, at best, and then obtainable only from others; whereas, the protestants own a large number of wells in other than the Oriskany fields and have been supplying the public with natural gas for periods of time ranging from 38 to 50 years. Cabot's contract with the Genesee Chemical Company is limited to a period of four years; those with the Kendall Refining Company and the Hanley Company to three years.

The geological structure of the Oriskany pool is such that one well can exhaust an entire pool in the absence of others. The wells drilled into a pool may be compared with pipes draining a common reservoir. Appellants' theory, as stated by its counsel before the commission, was that this condition required that the gas be taken out within a comparatively short length of time as the fields are drained very rapidly. Cabot purchased into these pools after they had been discovered and developed by others. In fact, Cabot acquired its wells after it had attempted to serve natural gas to consumers, without a certificate of public convenience, and after the inception of this proceeding by the incorporators of the Service Gas Company. The success of the Cabot venture depends, therefore, upon its ability speedily to dispose of the gas which it can take from these pools through the wells recently acquired. If Cabot can sell its gas in a volume greater than the owners of other wells in the same pools, it acquires that much more of the gas in the respective pools.

To best achieve its objective, Cabot is interested principally in industrial consumers who use a large amount of gas in a short space of time; for example, the requirements of the 4 companies previously mentioned as having contracted with Cabot would approach 10,000,000 cubic feet per day, and one industrial consumer, solicited by Cabot, alone would consume 14,000,000 cubic feet per day. Thomas D. Cabot, treasurer of Cabot and of the proposed Service Gas Company, testified that the intent was to undersell the present distributors of gas in so far as industrial consumers were concerned. It is not the function of the commission to expedite or assure substantial returns on a speculative venture. "The basis of the action of the commission is the interest of the public as distinguished from the interest of the corporation or individual making the application": *Perry County Telephone & Telegraph Co. v. P. S. C.*, 265 Pa. 274,

at page 281, 108 A. 659, at page 661. The record is re-
plete with appellants' declarations that they are inter-
ested primarily in the industrial users of gas, and only
in such service to the general public as they may find
it profitable, or be required, to render. The protesting
companies have a substantial number of industrial con-
sumers in addition to thousands of domestic consumers.
In the case of Manufacturers Gas Company the indus-
trial business amounts to 24 per cent. of its total. It is
clear that the volume of industrial business permits
lower rates to domestic customers. The acquisition of
this industrial business by appellants, with the result-
ing loss of sales by protestants, would place inevitably
a greater burden upon the domestic and other consum-
ers served by the latter. The testimony is sufficient to
show that appellants' service would for a time result in
a saving to probably three industrial consumers; but
it is not such as to require us to hold that the commis-
sion acted unreasonably or contrary to law when it de-
cided that appellants had failed to establish that the
approval of the application was necessary or proper for
the service, accommodation, convenience, or safety of
the public. "The question is not whether the granting
of the application will be for the convenience and ac-
commodation of some of the public, but whether it will
be for the convenience, accommodation and advantage
of the public generally and considered as a whole":
*Beaver Valley Service Company v. P. S. C. et al.,* 122
Pa. Superior Ct. 221, at page 225, 186 A. 304, at page
306.

The testimony does not reveal any evidence as to
the facilities which the Service Gas Company would
provide, or an estimate of its prospective revenue and
operating expenses, or a schedule of rates at which it
might be able profitably to supply gas in the territory
for which it seeks that privilege. Such information as
was furnished to the commission provided no basis from

which the commission could determine whether or not appellants could render adequate service at lower rates than those charged by the protestants and at the same time earn a fair return on the fair value of its property. Appellants argue, and properly so, that to submit such information is rather difficult. However, the generality of the testimony produced merely emphasized the true situation in connection with this proposed public service company. It is the medium through which Cabot proposes to operate. There is no evidence to show any fixed terms and conditions upon which it will be able to purchase gas from Cabot. Its capitalization is manifestly unequal to the project contemplated in its application, when viewed in connection with testimony that it costs $6,000 per mile to lay a 6-inch pipe line, and from $12,000 to $25,000 to drill a well. The inference from the testimony is that Cabot would furnish any additional capital that might be required for development; but it is under no obligation to do so. Thus, the proposed Service Gas Company is at the mercy of Cabot for its gas and its funds.

Appellants' contention that the refusal of the commission to approve their application for incorporation and issue a certificate of public convenience to the Service Gas Company amounts to a deprivation of property without due process of law, and is therefore violative of the Constitution of the United States and of the Constitution of Pennsylvania, is without merit. The proposed corporation has no property except the amount paid in as a required preliminary step to incorporation. It cannot be said to have been deprived of property when it has none; Cabot was not a party in this proceeding and is not a party to this appeal.

Appellants argue that there is an identity of interest between Cabot and the proposed Service Gas Company, and "that they are really one." Assuming, but not conceding, the truth of that proposition, the refusal of ap-

pellants' application would have been warranted on the ground that Cabot, by reason of its violations of the Public Service Company Law as found by the commission in its report, was an improper party to receive a certificate. *Hubert et al. v. P. S. C.,* 118 Pa. Superior Ct. 128, 180 A. 23. On the other hand, the true situation is that Cabot is a Massachusetts corporation, registered in the state of Pennsylvania, with no authority to act as a public service company. The Service Gas Company, although it ultimately might be owned and financed by Cabot, would be, nevertheless, a separate corporate entity.

The refusal of appellants' application did not deprive them or the proposed corporation of any property without due process of law, and one who is not a party to the present proceeding cannot complain.

Appeal is dismissed; order of the commission is affirmed.

Judge PARKER did not sit or participate in the decision of this case.