## Pittston Gas Company, Appellant, *v.* Pennsylvania Public Utility Commission.

366

Argued June 11, 1959. Before RHODES, P. J., WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ. (HIRT and GUNTHER, JJ., absent).

*Ernest R. von Starck,* with him *Norman T. Hayes, Jr.,* and *Morgan, Lewis & Bockius,* for appellant.

*William A. Goichman,* Assistant Counsel, with him *Thomas M. Kerrigan,* Counsel, for Pennsylvania Public Utility Commission, appellee.

*Charles E. Thomas,* with him *Lloyd S. Benjamin, Gomer W. Morgan,* and *Hull, Leiby and Metzger,* and *O'Malley, Morgan, Bour & Gallagher,* for intervening appellee.

OPINION BY ERVIN, J., September 16, 1959:

This is an appeal by Pittston Gas Company (Pittston) from an order of the Pennsylvania Public Utility Commission granting to Dade Area Gas Company (Scranton-Spring Brook Water Service Company) a certificate of public convenience to serve the Township of Exeter in Luzerne County and denying to Pittston the right to serve the Township of Exeter, Luzerne County, and the Township of Ransom, Lackawanna County.

On September 16, 1957 Pittston sought commission approval of a charter amendment and the beginning of the exercise of the additional right, power or privilege of providing gas service to the public in the territories of the Boroughs of Avoca, Duryea and Dupont and the additional territory of the Township of Exeter, Luzerne County. On September 18, 1957 Pittston also applied for approval of the incorporation of West Valley Gas Company (for subsequent merger) and for the approval of the beginning of the exercise of the right to provide gas service in the Borough of Old Forge and the Township of Ransom, Lackawanna County. Pittston subsequently indicated on the record that it was willing to have West Valley's applications considered as withdrawn insofar as they related to the Borough of Old Forge.

On September 30, 1957 Scranton-Spring Brook applied for the additional right and privilege of furnishing gas service in the Boroughs of Old Forge and Moosic, Lackawanna County. This application was uncontested and the commission in its final order awarded the territories of Old Forge and Moosic to Scranton-Spring Brook. Scranton-Spring Brook, on October 10, 1957, also filed an application for approval of the incorporation of Dade Area Gas Company (for subsequent merger) and approval of the beginning of the

exercise of the right to furnish gas service to the public in the Boroughs of Duryea, Avoca and Dupont and the Townships of Exeter and Plains, Luzerne County.

Protests to the granting of Scranton-Spring Brook's application and to the granting of Dade's application were filed by Pittston. Protests to the granting of Pittston's application were filed by Scranton-Spring Brook, Township of Exeter, Borough of Dupont and Borough of Duryea. The Township of Exeter subsequently withdrew its protest. Protests to the granting of West Valley's application were filed by Scranton-Spring Brook and the Borough of Old Forge. As a consequence, the contested areas covered by the applications include the Boroughs of Avoca, Duryea and Dupont and the Township of Exeter, Luzerne County, wherein both Scranton-Spring Brook and Pittston seek certification. The Township of Ransom, Lackawanna County, wherein only Pittston (West Valley) seeks authority, is opposed by Scranton-Spring Brook because it claims charter rights in the entire County of Lackawanna. The uncontested territory includes the Township of Plains, Luzerne County, and the Boroughs of Moosic and Old Forge, Lackawanna County, wherein only Scranton-Spring Brook seeks certification.

After hearings the commission, on August 25, 1958, granted the territories in dispute to Scranton-Spring Brook. On September 12, 1958 Pittston filed a petition for rehearing and reopening of the record and modification of the order of August 25, 1958, together with a request for a stay. On October 6, 1958 the commission granted a rehearing limited to testimony pertaining to the Townships of Exeter and Ransom. On March 2, 1959, after the rehearing had been held on October 22, 1958, the commission reaffirmed its order of August 25, 1958. A dissenting opinion was filed on March 9, 1959 by Commissioners Stahlnecker and Sharfsin, who

would have awarded the territories of the Townships of Exeter and Ransom to Pittston. Pittston accepted the commission's order as far as the Boroughs of Duryea, Avoca and Dupont, Luzerne County, are concerned and has taken this appeal only with regard to the Townships of Exeter, Luzerne County, and Ransom, Lackawanna County. The Township of Ransom was not applied for by Scranton-Spring Brook and the commission did not order Scranton-Spring Brook to supply such service. However, the commission did state in its order of August 25, 1958: "Inasmuch as Scranton-Spring Brook has charter rights throughout Lackawanna County, it has the duty and the obligation to reasonably and adequately provide for the needs of the public in the Township of Ransom." The commission, since it awarded the Township of Exeter to Scranton-Spring Brook, denied the Township of Ransom to Pittston. Inasmuch as the Township of Ransom is of very small size, there being only 13 customers at the present time, it is understood that Pittston does not desire to serve the Township of Ransom without the accompanying right of serving Exeter Township.

By order dated April 20, 1959 we granted Scranton-Spring Brook the right to intervene as a party appellee in these proceedings.

The issue in this appeal is, therefore, narrowed to the question of whether the commission abused its discretion in awarding the Township of Exeter to Scranton-Spring Brook rather than to Pittston in the light of all the facts and circumstances before the commission.

The Township of Ransom abuts the western border of the Borough of Old Forge. It is largely unpopulated. The portion of the Township of Exeter which lies east of the Susquehanna River abuts the northern border of the Borough of Duryea. A large portion of the Town-

ship of Exeter which lies west of the Susquehanna River abuts the Township of Ransom, which lies east of the Susquehanna River. The southern part of the Township of Exeter which lies west of the Susquehanna River is directly west of the Borough of Duryea and approximately one and one-half miles therefrom. The Township of Exeter is largely unpopulated except along Highway Route 92. A large plant of the Celotex Corporation was recently constructed in Harding, Exeter Township, and it is contemplated that this plant will use four times more gas than now being used by all of the present Pittston consumers. This plant was the prize that both contestants sought.

In Lackawanna County Scranton-Spring Brook already supplied gas to such places as Taylor, Scranton City, Dunmore, Blakely, Archbald, Jermyn, Mayfield, Carbondale and Fell. The addition of Old Forge and Moosic in Lackawanna County would give Scranton-Spring Brook an uninterrupted belt of service from Old Forge and Moosic through to the eastern end of the Borough of Fell. In Luzerne County Scranton-Spring Brook is already supplying natural gas to the Cities of Wilkes-Barre and Nanticoke and the Boroughs of Ashley, Plymouth, Larksville, Edwardsville, Kingston, Courtdale, Luzerne, Swoyersville, Forty-Fort, West Wyoming and Wyoming and the Township of Hanover. The Township of Plains is a natural extension from Wilkes-Barre and the addition of Duryea, Avoca and Dupont continues the belt from Lackawanna County. Scranton-Spring Brook supplies water in all of the areas it had applied for except Exeter. Scranton-Spring Brook is supplying natural gas in parts of Wyoming, Lackawanna, Luzerne, Columbia, Northumberland, Snyder, Montour and Lycoming Counties. Scranton-Spring Brook purchases its gas from Tennessee Gas Transmission Corp. near the Borough of Uniondale,

Susquehanna County, from whence it has a 12-inch pipeline extending 41½ miles across Lackawanna County through Scranton, Old Forge, Moosic, Duryea and then on to Wilkes-Barre in Luzerne County. This pipeline was constructed in 1957 at a cost of $2,250,000 and runs through the heart of the territory sought to be served by the two applicants. The pipeline was constructed with T's and valves so that connections could later be made to serve Duryea, Avoca, Dupont, Exeter and Old Forge. Scranton-Spring Brook proposes to construct a 6-inch distribution main for 13,000 feet on land and 2,600 feet in river crossings from its existing main in Duryea into Exeter Township (including two 6-inch parallel lines across the Susquehanna River) at a cost of $70,200.00. The total estimated cost for the construction of this line and for 6,420 feet of distribution mains, for regulator and meter station, for emergency storage facilities, for service lines including curb stops, for meters and meter settings, is $102,164.00.

Pittston supplies gas to the City of Pittston, the Boroughs of West Pittston, Exeter and Hughestown and the Townships of Jenkins and Pittston. In 1957 Pittston built a transmission main from the Harveys Lake Field in Ransom Township, Lackawanna County, along the west shore of State Highway Route 92 through Harding to West Pittston, at a cost of $135,-000.00. This line is approximately 5 1/3 miles long and consists of various diameters, the largest being 8 inches. Because of the failure of the Harveys Lake Field to supply Pittston with sufficient natural gas, Pittston on October 14, 1958 entered into an agreement with Trancontinental Gas Pipe Line Corporation (Transco) for a supply of natural gas. To take gas from the Transco line Pittston, at the time of the hearings, was installing a 5-inch lateral over 18,000 feet, which will run from the Leidy line in West Wyoming to the Bor-

ough of Exeter, from which point Pittston can hook up its Harveys Lake Field line and by reversing the flow of gas, use it as a distribution main. It was estimated that this lateral will cost $55,000.00. If we add to this the cost of the Harveys Lake line of $135,000.00 and $10,250.00 for other miscellaneous items, we arrive at an over-all cost of approximately $200,000.00 to Pittston to serve Exeter Township and 13 customers in Ransom Township. It is true, however, that Pittston proposes to use the Transco Leidy line for some local consumer use.

Counsel for Pittston argues that the commission's decision of August 25, 1958 in choosing Scranton-Spring Brook was founded upon the belief that Pittston did not then have a firm supply of natural gas. He further argues that when the order of March 2, 1959 was handed down by the commission, it did have a firm supply since at the hearing held October 22, 1958 Pittston had introduced into the record evidence which established that it would shortly have an assured natural gas supply based upon a final order of the Federal Power Commission, issued only a few days after the order of August 25, 1958. By telegram (not a part of this record) dated February 8, 1959, Pittston advised the commission that its new supply of natural gas had started. The error in this argument is that the commission did not base its decision solely upon that ground. In its order of August 25, 1958 the commission said: "The Scranton-Spring Brook Water Service Company has furnished convincing proof of its abilities to install, operate, and maintain adequate facilities for the purpose of furnishing gas service to the public in the areas covered by the applications. Indeed, a systematic record has been developed as to the company's experience, fitness, managerial organization, financial ability and also, as to the economic feasibility and need for the

service in this new territory. It is a locally owned and locally controlled corporation, and there is a decided preference for its service by the municipalities and the residents in each of the municipalities involved in the contested areas." It is true that later on in the order the commission did say: "In addition, the existing natural gas supply of the Pittston Gas Company is still inadequate to meet either its present or projected requirements." In the concluding paragraph of its order the commission stated: "It is our opinion, and we therefore find and determine that the public convenience and necessity can best be served, *under all the facts and circumstances of record* by granting authority to Scranton-Spring Brook Water Service Company to serve the areas covered by its applications." (Emphasis supplied) The majority of the commission, in the order of March 2, 1959, reaffirmed its position taken in the order of August 25, 1958 in the following language: "We have examined the additional evidence submitted by the parties, in connection with the record in the original proceedings, and we find and determine that the evidentiary matters urged in support of modification, do not alter the conclusion we have already reached. . . ."

Having considered the factual and procedural aspects of this matter, let us now turn to a consideration of the applicable legal principles.

Our scope of review is clearly set forth in §1107 of the Public Utility Law, Act of May 28, 1937, P. L. 1053, 66 PS §1437, as follows: "The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or violation of constitutional rights." See also *Noerr Motor Freight, Inc. v. Pa. P. U. C.*, 180 Pa. Superior Ct. 62, 66, 118 A. 2d 248; *Modern Transfer Co. v. Pa. P. U. C.*, 182 Pa. Superior Ct. 110, 113, 125 A. 2d 463.

This case presents nothing more than an administrative question to be decided by the commission. "It is a question which must be left in a large degree to the sound judgment of the commission and when that judgment has been exercised upon competent and relevant evidence the conclusion ought not to be disturbed by judicial interference unless it is made clearly to appear that it is unreasonable and not in conformity with law." *Collins v. P. S. C.*, 84 Pa. Superior Ct. 58, 63, 64; *Metropolitan Edison Co. v. P. S. C.*, 127 Pa. Superior Ct. 11, 15, 16, 191 A. 678; *Grimm v. Pa. P. U. C.*, 165 Pa. Superior Ct. 272, 67 A. 2d 658; *Pa. R. R. Co. v. Pa. P. U. C.*, 181 Pa. Superior Ct. 343, 124 A. 2d 685.

In passing upon an application for a certificate of public convenience the commission must consider the interest of the public, as distinguished from the interest of the corporation or individual making the application: *Perry Co. Tel. & Tel. Co. v. P. S. C.*, 265 Pa. 274, 281, 108 A. 659; *Beaver Valley Service Co. v. P. S. C.*, 122 Pa. Superior Ct. 221, 225, 186 A. 304; *Incorporators of Service Gas Co. v. P. S. C.*, 126 Pa. Superior Ct. 381, 392, 190 A. 653; *Modern Transfer Co. v. Pa. P. U. C.*, 139 Pa. Superior Ct. 197, 12 A. 2d 458.

The primary object of the public service laws is first and at all times to serve the interests of the public: *Colombo v. Pa. P. U. C.*, 159 Pa. Superior Ct. 483, 487, 48 A. 2d 59; *Sayre v. Pa. P. U. C.*, 161 Pa. Superior Ct. 182, 184, 54 A. 2d 95.

In *C. A. B. v. State Airlines*, 338 U. S. 572, 580, 70 S. Ct. 379, 384, 94 L. Ed. 353, 84 P.U.R. (NS) 387, 392, the Court said: " 'The only practical approach that can be taken in cases of this type is to consider the applications, not with a view as to how an individual proposal would benefit the applicant . . . but rather to consider the entire case with the objective of establishing a sound transportation pattern in the area involved.'

8 C.A.B. at 722. We think the standard adopted by the Board under which the public interest is given a paramount consideration is a correct standard."

We approve the language of the commission as follows: "Pittston Gas Company's contention that Exeter and Ransom townships clearly should be served by it is based upon the existence of its new line in Exeter Township to Harveys Lake gas field in Ransom Township, but that line was a risk assumed by Pittston in its endeavor to secure a supply of gas. . . . However, it is apparent that these contentions express a concern on its part that, if Pittston is not permitted to serve in Exeter Township its new line will become virtually worthless when Pittston ceases to use Harveys Lake field as a source of gas supply and that, aside from Exeter Township, Duryea, Avoca, and Dupont provide the only possibility for expansion of the Pittston system. These contentions merit little consideration when the matter of prime concern is the accommodation, convenience, and safety of the public."

The controlling consideration in choosing one from among a number of applicants to render service by a public utility requires the selection of that applicant best fitted to carry out the duties imposed by the certificate. Consideration should be given to such matters as experience, fitness, managerial organization, financial resources and kindred matters.

Let us now turn to the record and ascertain what it reveals as to these applicants. On July 31, 1957 Scranton-Spring Brook operated 1,038 miles of gas mains, serving 76,378 customers, keeping 859 permanent employes busy, 405 of whom live in the Luzerne-Lackawanna County area. Pittston, as of September 30, 1957, served a total of 3,189 customers. Pittston is a subsidiary of Penn Fuel Gas Co., a holding company owning 14 gas subsidiaries in Pennsylvania, including

Pittston. The 14 gas subsidiaries serve a total of 21,-745 customers. Penn Fuel Gas Co. provides management, operational assistance and financing for subsidiary companies. Pittston itself employs 17 persons while the entire system of Penn Fuel Gas Co. maintains 187 employes located throughout the State.

Scranton-Spring Brook is a Pennsylvania public utility corporation and is completely subject to the control of the commission. Penn Fuel Gas Co., being a holding company, is not a utility and is not subject to the regulation of the commission. It is a separate corporation from Pittston, which is the applicant in this case. Penn Fuel Gas Co.'s financial obligation to Pittston and, for that matter, to the users in Luzerne and Lackawanna Counties, is purely voluntary rather than obligatory. In *Incorporators of Service Gas Co. v. P. S. C.,* supra, we said: "The inference from the testimony is that Cabot would furnish any additional capital that might be required for development; but it is under no obligation to do so. Thus, the proposed Service Gas Company is at the mercy of Cabot for its gas and its funds."

The record reveals that Scranton-Spring Brook presented to the commission a complete and sound plan to render service to all of the municipalities applied for. On the other hand, Pittston's exhibits were incomplete in certain respects. It had no exhibits showing the amount of gas contemplated to be consumed by users in Avoca, Duryea, Dupont, Exeter and Ransom apart from its total requirements. These proceedings should be considered in their over-all application to all of the municipalities applied for and should not be considered as to Exeter Township alone. The commission considered that in order to make the entire project economically feasible, all the territory had to be awarded to the company offering the best plan for the public in

all of the municipalities involved. For the commission to have reduced the territory awarded to Scranton-Spring Brook by the Township of Exeter would have been a pro tanto reduction in the economic feasibility of the entire project.

A comparison of the financial statements of the two applicants will reveal that Scranton-Spring Brook had $5,525,452 in current assets as against $2,232,839 in current liabilities. On the other hand, Pittston had current assets in the sum of $39,880.00 as against $50,060.00 in current liabilities. Scranton-Spring Brook had cash on hand of $2,013,584 as compared to Pittston's $4,835.00. Scranton-Spring Brook maintained a better balanced financial structure with a 43% equity to 57% debt, whereas Pittston's corresponding figures were 30% equity to 70% debt.

The financial responsibility of the applicant should receive real consideration in a matter of this kind: *Re Northwest Natural Gas Co.*, 6 P.U.R. 3d 403, 415; *Re Edington*, 10 P.U.R. 3d 146, 155; *Southside Trans. Co. v. Commonwealth*, 161 S.E. 895.

Scranton-Spring Brook has available for repair and emergency service superior equipment, such as a giant tapping machine capable of closing off or tapping pipelines from 6 inches to 12 inches in diameter and up to 500 lbs. in pressure without shut-down. It has an automatic electric power generating unit in the event of a power failure at its Uniondale Station. It has a complete radio network with 24-hour operation, consisting of base stations and two-way radio equipped cars and trucks. It has a telemetering hookup to enable gas dispatchers on 24-hour duty to know pressure and quantities of gas at all key points in the system. It has adopted the American Standard Code for Gas Transmission and Distribution System, under which it has installed duplicate regulators, safety relief valves, oil seals, check

valves and blow offs. It installs cathodic protection beds, anodes, drain lines, etc. to preserve its pipes and lines.

There is a decided preference for its services by the municipalities and the residents in each of the municipalities involved in the contested areas.

Scranton-Spring Brook's managerial fitness and experience are superior to that of Pittston. Scranton-Spring Brook presented a plan which revealed the economic feasibility of supplying the contested areas. It estimated a return on its investment of 4.12% on the entire project. Pittston presented no exhibit for all of the contested areas. It presented figures for the Townships of Exeter and Ransom only.

Pittston never had a contract for a firm supply of gas from the Harveys Lake Field. The Harveys Lake development by Transcontinental Production Co. was an exploratory venture and an effort to locate a new storage location. Pittston started taking gas from this source on November 7, 1957. By December 27, 1957 Pittston could not serve its existing territory, much less any new territory, with natural gas from Harveys Lake Field. By February 27, 1958 this source could supply only approximately 30% of Pittston's existing gas requirements. Pittston's building of a pipeline at a cost in excess of $150,000.00 from a doubtful source of supply with no firm contract for supply of gas is alone sufficient reason to support the commission's finding in favor of Scranton-Spring Brook, particularly when the record shows that Scranton-Spring Brook's management pursued a sound, safe, logical policy in its efforts to bring service to the area.

Scranton-Spring Brook has shown 100 years of experience, unquestioned fitness, sound, logical management and extensive organization, financial ability, safeguards to the public and dependability in rendering service.

Pittston was incorporated on December 17, 1946 and is a much younger and smaller company than Scranton-Spring Brook, with much less experience.

There is ample evidence in this record to support the decision of the commission and we therefore affirm its order.